[No. 3113-1.    Division One.    June 30, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD PAUL CLARK, *Appellant*.

*Burks, Bell & Kirkpatrick* and *Donald P. Kirkpatrick,* for appellant (appointed counsel for appeal).

*David S. McEachran, Prosecuting Attorney,* and *William A. Gardiner, Deputy,* for respondent.

SWANSON, J.—Ronald Paul Clark appeals from a judgment and sentence entered upon a jury verdict finding him guilty of one count of grand larceny. His primary contention is that the trial judge erred in instructing the jury as to the meaning of the word "value" such that it was unable to determine properly whether the value of the subject property was more than $75.

Testimony presented at trial indicated that just prior to noon on Saturday, April 20, 1974, Clark was observed loading into his red pickup truck pieces of steel from a rack located outside of a building at Wakefield Seafoods in Bel-

lingham. Wakefield employees described the steel pieces as having been cut from originally-purchased stock of various types, including "flat bar," "pipe," "square tubing," "solid shaft" and "channel steel," which was stored in the rack to be cut and used as needed in Wakefield's manufacture of parts for crab and shrimp processing equipment. When confronted by Wakefield employees, Clark stated that he had been looking for work and that a man, whom he described but whom he was unable to identify, had directed him to move the steel. Clark was asked to replace the steel whereupon he complied and left the area. At about 8 p.m., Clark returned to the premises and was apprehended by police who found him again loading the steel pieces into his pickup truck. The pickup truck contained 39 pieces of steel which weighed between 1,000 and 1,500 pounds. Clark testified that he had doubted the authority of the Wakefield employees to instruct him not to remove the steel and therefore returned to complete the job assigned by the unidentified man.

A key issue facing the jury, if it believed a larceny had been committed, was to determine whether the pieces of steel involved had a value of more than $75 so that a conviction for grand larceny, rather than petit larceny, was proper. RCW 9.54.090(6). The three Wakefield employees who first discovered Clark moving the steel testified that the steel was not scrap but was used in the company's manufacturing business.[1] Lloyd Fredrickson, chief engineer for Wakefield, also testified that the steel was not scrap, indicating that scrap steel was placed in barrels kept for that purpose and not on the rack, and testified as follows as to its value:

---

[1] The testimony of Wakefield machinist Arnold E. Jones is representative: "Q Is this scrap steel you keep out there? A No, it's not. Q Do you use this steel in fabricating parts and in your business? A We use this steel in fabricating machinery. It might be of interest to say here that when we go and cut off a piece of steel to be used to make a part with or a machine with, if we only cut half of it away and only need half of it, we certainly don't throw away the other half. It's still new steel as far as we're concerned."

Q Mr. Fredrickson, are you aware of the prices of steel that are purchased through your engineering department? A I certainly am. Q And do you supervise the purchasing of these in your capacity as chief engineer? A I buy it all myself. Q Are you familiar with the prices that are paid for pieces of steel that are used in your occupation? A Yes, sir. Q And in regard to the steel that you observed in the back of the pickup truck on this night in question, if you had to replace this steel would you be familiar with the range of prices that you would have to pay for this steel? A Well, I'm sure that the steel that I saw in his truck, or in the truck was worth a minimum of $400 to us, in current prices. When we bought it, not today, when we bought it. Q What would be the prices today? A I would say they'd be 30 per cent higher.

On cross-examination, Fredrickson stated:

Q How much do you think this steel would have been worth if it had been sold by a private individual driving around in a pickup truck asking whoever he could find to buy it? A I don't know that. The only thing I know is what it's worth to me.

Skip Johnson, employee of a steel company which deals in new and scrap steel, testified that the market value of the steel in question, excluding labor costs, was $472 on April 20, 1974. On cross-examination, he stated he would pay only $30 if he were purchasing the steel as scrap. On redirect, he stated:

Q How do you determine what is scrap? A We don't determine if it's scrap or not ourselves. When we're buying it the person who brings it in has judged it to be scrap. What's one person's scrap could be another person's little gold mine. . . . Q Would there be two values then on this type of steel depending on what purpose the individual is holding it for? A Sure. You can come over in the warehouse and buy it for 35 cents a pound, walk it across the street [to a scrap yard] and sell it for a penny a pound all day long if you want.

Two scrap dealers testified for the defense, each stating that he would purchase the pickup load of steel as scrap for

about $30. Both indicated that the cost might be higher than $75 under other conditions.[2]

On appeal, Clark contends that the trial court erroneously caused the jury to find him guilty of grand larceny by giving the italicized portion of the following instruction No. 9:

"Value" as used in these instructions means the price which the property will bring on the market. In determining the value or fair market price of the property in question, you may take into consideration the original cost of the property, *the purposes for which the owner intended the property*, its age and its present condition, and any competent testimony as to its present market value.

(Italics ours.) The State directs us to no authority in which the precise language in question has been approved, but argues that it properly may be based upon the holding in *State v. Duncan*, 148 Wash. 57, 268 P. 139 (1928). In *Duncan*, where the larceny of prize chickens was involved, our state Supreme Court held that the trial court had not erred in failing to instruct the jury that a guilty verdict could be returned only for petit larceny inasmuch as the market value of the chickens, if sold for food consumption, would be less than $25 (which was the value then necessary to support a conviction for grand larceny). In upholding the jury's verdict finding the defendant guilty of grand larceny, the court stated at page 59:

---

[2] On cross-examination, Gundie Gunderson testified, "A . . . The demand sets the value. I imagine if he has to go like to a steel broker, you'd have to have a regular price plus labor. Q You're going to be paying at least 35, probably 35 cents a pound plus labor, wouldn't you? A It's possible, yes."

Art Zwicki estimated the steel to weigh 1,000 pounds and testified on direct examination, "Q . . . How much would you sell it to me for? A Because we do deal in new steel also, I would say 10 cents a pound." Thereafter, he stated he could sell steel as scrap for $75 per ton. On cross-examination, however, he testified, "Now, steel is running, good steel is running at this time from 20 cents to 50 cents a pound, isn't it? A You're high. I would say 20 to 30 unless he's overbuying. I don't know where the place would be that would sell it at 50 cents."

There was no evidence controverting the testimony of the state as to the value of the chickens for breeding purposes, and we think it clearly sufficient to base a verdict thereon. It also seems obvious that the market value to be arrived at, in such a case as this, does not mean the market value for food consumption, but the market value for the purposes for which the thing taken is intended and best adapted.

Clark argues that *Duncan* does not support the trial court's instruction No. 9 given in this case because there was no evidence that the steel in question was of a special or "prize" nature, but this argument misses the mark.

In *Duncan,* the threshold question presented for the jury was whether the chickens were prize chickens having a market value for breeding purposes in excess of $25, or whether the chickens were raised primarily for food consumption and thus had a market value of less than $25. In this case, the threshold question confronting the jury was whether the steel had a market value for use in Wakefield's manufacturing enterprise in excess of $75, or whether the steel basically was scrap steel with a market value of less than $75.

In the context of the present record, it is evident that the jury interpreted the instruction that they could consider "the purposes for which the owner intended the property" to mean that they could determine whether or not the steel was scrap steel. As the witness Johnson testified, "When we're buying it [steel] the person who brings it in [the owner] has judged it to be scrap." The record is devoid of any testimony as to a fanciful or idealized purpose for which the owner, Wakefield, may have intended to use the steel which might have led to improper speculation on the part of the jury.[3] The witness Fredrickson's testimony is

---

[3]The trial counsel argued as follows to the court in taking exception to instruction No. 9: "I would not quarrel with the concept that market value is bound up with what a good is intended for, reasonably intended for, and certainly for what a good is best adapted for, but I think when we include the State's phrase 'for which the owner intended the property,' we then allow an element of unreasonableness to creep in and I think that the statute in question had in mind the fair

typical of that relating to "the purposes for which the owner intended the property," *i.e.*, whether or not the steel was scrap:

> Q Now, if the steel has been cut, does it become scrap steel at that point? A No, sir. Q Is it steel you can use? A We'd have thrown it out. We have barrels for that and we'd throw it out, and sell it to Parberry, or whoever. Q If it were scrap or if it were good? A If it were scrap it would be thrown out in barrels. Q The steel that you have up here, is that steel you do retain and use in your business, you've indicated near the loading rack? A Yes, sir.

Fredrickson went on to testify that if the steel in question were stolen, Wakefield would have to purchase new steel at a minimum cost of $400.

■ There is no doubt that the proper standard by which a jury should determine "value" in a case such as this is "market value." RCW 9.54.100. Evidence of value in criminal cases is proved in the same manner as in civil cases. *State v. Hammond*, 6 Wn. App. 459, 493 P.2d 1249 (1972); *State v. Melrose*, 2 Wn. App. 824, 470 P.2d 552 (1970). "Market value" is defined in this state as the price which a well-informed buyer would pay to a well-informed seller, where neither is obliged to enter into the transaction. *State v. Rowley*, 74 Wn.2d 328, 444 P.2d 695 (1968); *State v. Sherrill*, 13 Wn. App. 250, 534 P.2d 598 (1975). *See also McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 413 P.2d 617 (1966); *Donaldson v. Greenwood*, 40 Wn.2d 238, 242 P.2d 1038 (1952). In the context of larceny prosecutions, the following principles are applicable to determine value, as set forth in 52A C.J.S. *Larceny* § 118, at 618-19 (1968):

If the property has a market value the evidence must

market value which economists can argue over forever, but I think that too much reliance is being placed on the, by this instruction . . . on the whims or the possible fantasies of an individual owner of property as to what that property was worth, and for that reason, Your Honor, we would except to that portion of instruction No. 9. THE COURT: Exception is noted, the instruction will stand. I think under the circumstances of this case it's appropriate, although it might not be in some other cases."

be limited to such value, at the time and place of the offense or at a nearby place, but evidence of value at a distant point is not competent. Evidence of value based on any other standard is inadmissible, such as the value thereof to any particular person. Where it does not appear that there is any absolute standard by which the market value may be determined with definiteness and certainty, any facts which reasonably tend to show the present value of the stolen property may be admitted. Thus it has been held that evidence of the purchase price, selling price, and the condition of the property when stolen is admissible, especially when the property has been used but a short while. . . .

In the absence of a market value, evidence of the actual value, or the replacement value, or the saleable value at a secondhand dealer, or its value to the owner, or the sale price for junk, of the property stolen has been held admissible. However, it is well settled that evidence of any other valuation but the market value of stolen property has been held inadmissible unless it is first shown that there is no market value.

(Footnotes omitted.) *See also People v. Hernandez*, 250 Cal. App. 2d 842, 58 Cal. Rptr. 835 (1967); *People v. Cook*, 233 Cal. App. 2d 435, 43 Cal. Rptr. 646 (1965).

In this case, there was competent evidence relating to two market values for the steel in question, depending upon whether it was sold as scrap or sold as new steel to be used in the manufacture of machinery. The trial court's instruction No. 9 did not improperly direct the jury to consider the *value* of the property to the owner in determining market value, but it did direct attention to the *purposes* for which the owner intended to use the property. In view of the fact that the testimony offered as to the owner's purpose related only to the underlying question of whether or not the steel was scrap, we are unable to say that the instruction misled the jury into the consideration of purposes outside of the realm of reason. We do not regard the instruction No. 9 as a model to be used in cases such as this. *See State v. Rowley*, 74 Wn.2d 328, 444 P.2d 695 (1968). It is apparent, however, from the record here that the instruction did not result in unfair prejudice to the

appellant Clark, and therefore it caused no error requiring reversal.

■ Clark also argues that the evidence presented by the State is insufficient to support the jury's determination that he took the steel in question with the intent to deprive or defraud the owner thereof or that the value of the steel was $75 or more. This contention requires only summary discussion. Clark failed to renew his motion challenging the sufficiency of the State's case after having presented evidence upon his own behalf, and therefore he cannot predicate error claimed on appeal upon the sufficiency of the evidence. *State v. Nelson*, 63 Wn.2d 188, 386 P.2d 142 (1963). In any event, we are satisfied upon reviewing the record that the State's evidence met the appropriate standard. *See State v. Smith*, 12 Wn. App. 720, 531 P.2d 843 (1975); *State v. Braxton*, 10 Wn. App. 1, 516 P.2d 771 (1973); *State v. Johnson*, 9 Wn. App. 766, 514 P.2d 1073 (1973).

The judgment is affirmed.

FARRIS and JAMES, JJ., concur.